**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| A. SAMSON PILLAY and ANTHONY RAMIREZ | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | No. 09-cv-5725 |
| MILLARD REFRIGERATED SERVICES, INC. | ) ) ) ) | Judge Joan H. Lefkow |
| Defendant. | ) ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

A. Samson Pillay ("Pillay") and Anthony Ramirez ("Ramirez") filed this law suit against

Millard Refrigerated Services, Inc. ("Millard") alleging claims under the Americans With

Disabilities Act ("ADA"), 42 U.S.C. §§ 12102 *et seq*.[1] and several Illinois law claims. Ramirez

alleges employment discrimination in violation of the ADA (count I) and retaliatory discharge under

Illinois law (count III). Pillay alleges retaliation in violation of the ADA (count II) and state law

claims of retaliatory discharge (count IV), libel/slander (count V), tortious interference with a

prospective contract (count VI), and negligent spoliation (count VII).[2] Millard has moved under

---

[1] Effective January 1, 2009, the ADA was significantly amended. *See* ADA Amendments of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). Because Congress "did not express its intent for these changes to apply retroactively," the court will apply the version of the ADA in place when the events that gave rise to the claims at issue took place. *See Fredricksen* v. *United Parcel Serv., Co.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009).

[2] This court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b) as the parties reside in this district and the events that gave rise to Ramirez and Pillay's claims occurred in this district.

Federal Rule of Civil Procedure 56 for partial summary judgment as to counts I, II, IV, V, and VI. [Dkt. 82.] For the reasons explained below, the motion is denied with respect to counts I and II and granted with respect to counts IV, V, and VI.[3]

## FACTUAL BACKGROUND[4]

Millard is a third party logistics company that warehouses its customers' perishable products in a refrigerated or frozen environment. (Def. L.R. 56.1 ¶ 3.) Millard does not own any of the products; rather, it receives and stores those products for a fee and then ships them elsewhere as directed by its customers. (*Id*. ¶ 4.) In 2000, Pillay began working at Millard's facility in Geneva, Illinois as a Human Resources Coordinator. (*Id*. ¶ 30.) Ramirez began working at Millard's Geneva facility beginning in 2008 as a temporary employee and later as a "regular" (as opposed to temporary) employee. (*Id*. ¶ 9.)

**Anthony Ramirez**

Before working at Millard, Ramirez worked at Home Depot as part of a freight team, stocking shelves after business hours. (Def. L.R. 56.1 ¶ 6.) In October 2007, while working at Home Depot, Ramirez suffered an on-the-job injury to his knee, which required surgery. (*Id*.) Ramirez was off work for a period of three months. (*Id*. ¶ 7.) By the time he returned to work at

---

[3] In order to maintain a claim under the ADA, a plaintiff must file charges with the EEOC within 300 days of the alleged unlawful employment practice. *Stepney* v. *Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004). Ramirez and Pillay both brought charges with the EEOC based on the conduct giving rise to their ADA claims within this time period.

[4] The facts are stated in the light most favorable to Ramirez and Pillay, and are taken from the parties' statement of facts and supporting documents pursuant to Local Rule 56.1. Millard's statements of facts are abbreviated as Def. L.R. 56.1, and its response to Ramirez and Pillay's statements of facts are abbreviated as Def. Resp. to Pl. L.R. 56.1. Ramirez and Millard's statements of facts are abbreviated as Pl. L.R. 56.1.

Home Depot, Ramirez had made a complete recovery. (*Id*.) He could do everything he had been able to do before the injury. (*Id*.)

In connection with the injury, Ramirez filed a Worker Compensation ("WC") claim and received a settlement in the amount of $12,000. (Def. L.R. 56.1 ¶ 6.) After submitting his WC claim, the Illinois Industrial Commission ("IIC") informed Ramirez that he had a 17.5 percent disability (or 17.5 impairment rating). (*Id*. ¶ 17.) In February 2008, approximately a month and a half after returning to work, Home Depot terminated Ramirez due to his failure to report an accident involving damage to merchandise. (*Id*. ¶ 8.)

During June, 2008, Ramirez was hired for a position at Millard through a temporary employment agency. (Def. L.R. 56.1 ¶ 9; Pl. L.R. 56.1 ¶ 16.) As a temporary employee, Ramirez worked as a "picker," a position which entailed using an electric pallet jack or forklift to fulfill orders of refrigerated or frozen products to be shipped. (Def. L.R. 56.1 ¶ 9.) On his June 2008 employment application, Ramirez indicated that he would be "able to consistently and reliably perform the essential functions of the job with or without reasonable accommodation." (*Id*. ¶ 11.) The application did not ask about any prior work-related injury. (*Id*.)

Temporary employees who performed satisfactorily were eligible for regular employment with Millard. (Def. L.R. 56.1 ¶ 10.) Applicants were required to fill out a Personal and Confidential Conditional Job Offer & Medical Review Form ("Conditional Job Offer Form"). (*Id*.) Ramirez had received good reviews as a temporary employee (Pl. L.R. 56.1 ¶¶ 17–18), so he applied for a regular position.

In his Conditional Job Offer Form, Ramirez disclosed that while working for Home Depot he had suffered an on-the-job injury to his knee which required three months off work and that he

3

had filed a WC claim in connection with that injury. (Def. L.R. 56.1 ¶ 14, Exhibit ("Ex.") F.) Ramirez further provided on his application that he had no (0 percent) permanent disability resulting from the October 2007 injury. (*Id.*) On July 28, 2008, Millard hired Ramirez as a regular employee. (*Id.* ¶ 12.) Ramirez was then reassigned to a new position operating a forklift. (Pl. L.R. 56.1 ¶ 21.)

Ramirez, like other new hires, was subject to a 90 day probationary period. (Def. L.R. 56.1 ¶ 12.) The purpose of the probationary period was to allow the employee time to adjust to his or her new position while providing the supervisor an opportunity to assess the employee's suitability to the position and to verify information provided on the Conditional Job Offer Form. (*Id.* ¶¶ 14, 28.) Moreover, Millard employed a labor management system ("LMS") to track its warehouse employees' productivity and performance, which it would then measure against its own performance standards. (*Id.* ¶ 26.) Millard advised Ramirez that it expected his productivity to be between 95 and 98 percent. (*Id.* ¶ 27.) Millard expected a performance level of 100 percent for its employees. (*Id.*) Probationary employees at Millard were held to a higher standard of conduct. (*Id.* ¶ 28.) Ramirez was told that his performance and LMS numbers were great. (Pl. L.R. 56.1 ¶ 21.)

Ramirez's Conditional Job Offer Form was sent to Millard's headquarters in Omaha, Nebraska. (Pl. L.R. 56.1 ¶ 22.) Rachel O'Dell, a Claims Risk Management Specialist for Millard at headquarters, reviewed Ramirez's Conditional Job Offer Form. (Def. L.R. 56.1 ¶¶ 18–19.) O'Dell recognized that missing three months of work as the result of a knee injury indicated that the injured worker had undergone surgery and that, in Illinois, an injury requiring surgery would not yield a zero percent impairment rating as Ramirez had indicated on his Conditional Job Offer Form. (*Id.* ¶ 20.)

O'Dell advised either Mark Domroes, General Manager of the Millard Plant in Geneva, or Pillay that Ramirez had an impairment rating assigned by the ICC which he did not indicate in his Conditional Job Offer Form. (Def. L.R. 56.1 ¶ 22.) On August 20, 2008, Domroes emailed Nick Dayan, Millard's Senior Vice President of Human Resources:

> Don't forget about Anthony Ramirez. We discussed he was an injury risk, had a 13 wk settlement from a previous job and was rated 17.5% perm disability. Is he someone we want to probation out now? (hired 7/28)

(Pl. L.R. 56.1 ¶¶ 6–7.) Dayan responded to Domroes the same day, "We have this all documented right? . . . Let's get him out asap." (*Id.* ¶ 7.) Dayan testified that his response to Domroes' email was in reference to a separate conversation regarding Ramirez's performance. (Def. Resp. to Pl. L.R. 56.1 ¶ 8.) During his deposition, Domroes explained his understanding of the 17.5 percent disability rating referenced in his email to Dayan:

> This information was supplied to me by Sam, Sam Pillay. So he had brought it to my attention that he had found out that this person was - - like I said, was previously injured, had a permanent disability, he was a recent new hire. And my understanding was that it was not put on his application. I don't know - - I can't speak for Sam. I don't know that we would have hired someone if that was known up front just because of the physical requirements for the job and having to lift and twist and, you know, that would have probably had to potentially gone through our corporate office. So that was brought to my attention, so I wanted to run it up the ladder. I was not going to make a decision to keep him or not keep him. So my question basically to Nick was giving him the facts, just saying that, hey, this gentleman has come here with some physical limitations, he's a new hire, he's still on probation, you know, he's a probationary employee. So my understanding under Illinois law, that, you know, you can be let go for any reason whatsoever. And the second email was from Nick telling me to - - instructing me to let him go.

(Def. L.R. 56.1, Ex. B, Domroes Dep. at 25–26.) Domroes testified about physical abilities that he believed Ramirez was lacking:

> To be honest with you, in looking at the e-mail, and again I told you I did not recall whether this was legs or arms, but, you know, the - - there's lifting involved with the jobs, especially new hires traditionally have put - - are put into a picking role.

5

That is the probably - - I don't necessarily want to say an entry level, because we fill employees where they're needed. But case pickers are in the freezer for the longest period of time, so it's the roughest, so you kind of graduate out onto the docks of loading and unloading as you get with experience, and you're operating a piece of equipment which takes more skill.

So, you know, to operate a piece of equipment, you need a skill set with, you know, a fully functioning - - I mean, if you're limited in any capacity, and I'm not a doctor, I don't know what 17-and-a-half percent means. But if there's a potential there that he can't steer the forklift properly or brake properly, that he can't manage that, that is a potential risk to other employees. Lifting requirements, I believe it was at least 25 pounds, if not up to 50 pounds, that they're required to lift, so that could be a potential if he's - - he could injure himself. If he was favoring one arm or one leg, he might put undue duress on another part of the body and then potentially risk injuring himself. So I believe that the thought process behind that was to avoid a potential workers' comp claim and injury to himself and/or others.

(Def. L.R. 56.1, Ex. B, Domroes Dep. at 27–28; Pl. L.R. 56.1 ¶ 4.) With regard to the decision to terminate Ramirez, Domroes explained that "we've had terminations for performance and - - but in this case, this wasn't really performance related directly, it was about his - - his ability to do the job and his injury, previous injury." (Def. L.R. 56.1, Ex. B., Domroes Dep. at 41.)

On August 21, 2008, after approximately four weeks on the job, Ramirez had a performance level of 59 percent, which was lower than Millard's claimed performance expectation level of 100 percent. (Def. L.R. 56.1 ¶ 29, Ex. J.) Millard terminated Ramirez on August 21, 2008. (Def. L.R. 56.1 ¶ 28.) Millard provided Ramirez with a "Termination Report" which checked a box titled "PROBATIONARY PERIOD; NO MISCONDUCT" denoting the reason for his termination. (Pl. L.R. 56.1 ¶ 26, Ex. 16.) The Termination Report did not reference Ramirez's LMS-determined performance level as the reason for his termination. (*Id*.) In August 2009, the raw data used to create Ramirez's LMS numbers were automatically deleted. (Pl. L.R. 56.1 ¶ 32.)

6

### A. Samson Pillay

Millard hired Pillay on April 17, 2000 as a Human Resources Coordinator. (Def. L.R. 56.1 ¶ 30.) Part of Pillay's duties included being involved in hiring and firing. (*Id*.) He "administered" terminations based on the recommendations of supervisors, the operations manager, or the General Manager. (*Id*. ¶ 31.) From 2000 to 2008, Pillay received good/great performance reviews in addition to pay raises and bonuses. (Pl. L.R. 56.1 ¶ 11.) Pillay did not work with or know Ramirez when Ramirez worked at Home Depot. (Def. L.R. 56.1 ¶ 65.)

Dayan began working at Millard in its corporate headquarters on March 17, 2008. (Def. L.R. 56.1 ¶¶ 32, 34.) Shortly thereafter, Dayan reviewed a complaint dated March 7, 2008 about Pillay. (*Id*. ¶ 35.) On March 26, 2008, Dayan received another complaint that referred to Pillay. (*Id*. ¶ 37.) In March and April 2008, Dayan visited the Geneva facility, at which time he received numerous verbal complaints about Pillay. (*Id*. ¶ 40.) The complaints were directed to Pillay's (1) lack of confidentiality in his HR role; (2) discouraging/warning employees about attempting to contact corporate headquarters; (3) withholding freezer gear from employees; (4) mean, disrespectful and abusive treatment of employees; and (5) general unapproachability. (*Id*.) Dayan discussed these complaints with Pillay and decided in collaboration with Domroes that Pillay would be placed on a performance improvement plan ("PIP"), the goal of which was to make Pillay a better employee by addressing deficiencies identified in his performance. (*Id*. ¶¶ 45-46.) The PIP identified a number of areas of needed improvement, including (1) confidentiality; (2) favoritism; (3) hiring; (4) communication; and (5) employee development. (*Id*. ¶ 45.) The PIP also required Pillay to complete the program and to maintain sustained results after the program's completion. (*Id*. ¶ 46.) Pillay did not believe that the PIP was merited (Pl. L.R. 56.1 ¶ 13) and disagreed with the terms

7

contained therein. (Pl. L.R. 56.1, Ex. 12.) Millard had received complaints about other Millard employees during 2007, but only Pillay received disciplinary repercussions. (Pl. L.R. 56.1 ¶ 36.) Specifically, Dayan reviewed prior complaints about Operations Manager Mike Polerecky and Domroes. (Def. L.R. 56.1 ¶ 42; Pl. L.R. 56.1 ¶ 36.)

The PIP went into effect on May 5, 2008 (Def. L.R. 56.1 ¶ 49) for a ninety-day period, setting a schedule of three follow-up meetings every thirty days. (Pl. L.R. 56.1 ¶ 14.) On June 2, 2008, Domroes and Pillay had a PIP follow-up meeting, at which time Domroes concluded that "[Pillay] has achieved the required improvements." (*Id.*) On August 1, 2008, the PIP expired (*id.* ¶ 15); however, the PIP required "sustained results" for continued employment. (Def. L.R. 56.1 ¶ 46.)

During August 2008, Dayan received additional complaints from other Millard employees about Pillay. (Def. L.R. 56.1 ¶ 60(a)–(h).)[5] At about this same time, Pillay requested documentation regarding Ramirez's termination, and on August 21, 2008, Domroes forwarded Pillay the August 20, 2008 email between himself and Dayan concerning Ramirez. (Pl. L.R. 56.1 ¶ 24.) Pillay met with Dayan and alleges that they had a heated argument during which Pillay protested Ramirez's termination. (*Id.* ¶¶ 25–26.) Pillay testified that he told Dayan that terminating Ramirez because he had a disability and had filed a WC claim was illegal. (*Id.* ¶ 25.) Despite his protest, Pillay alleges that Dayan ordered him to terminate Ramirez. (*Id.* ¶ 26.)

Millard, on the other hand, disputes that Pillay ever objected to Ramirez's termination. (Def. L.R. 56.1 ¶ 56.) Domroes testified during his deposition:

---

[5]Although made in August, some of the complaints were not documented until after Pillay was fired on August 26, 2008. (Pl. L.R. 56.1 ¶ 29.)

> I do not recall what stance Sam took. I know - - so I - - I remember we had some conversations about whether to keep him or not, and then it was something that was - - neither one of us were willing to make that call, you know, 'What should we do in this case? It's come to our attention that he has some permanent disability that may affect his ability to perform. He could be a safety risk to himself and others. And what should we do?' And I - - if - - and from seeing this email, I know Sam wasn't going to do anything without getting something in writing from Nick, and that's why I forwarded that.

(Def. L.R. 56.1, Ex. B, Domroes Dep. at 43–44.) Dayan disputed that a heated argument took place with Pillay (Plf. L.R. 56.1 ¶ 27) and denied that Pillay objected to Ramirez's being terminated. (Def. L.R. 56.1 ¶ 57.) Dayan claimed that Pillay actually recommended that Ramirez be terminated along with other employees who needed to be disciplined or terminated. (*Id.* ¶ 57.) In explaining its rationale for firing Pillay, Dayan stated that because the PIP required "sustained results" for continued employment and in light of the additional complaints concerning Pillay, Dayan recommended that the Millard Executive Committee terminate Pillay's employment. (*Id.* ¶¶ 61, 66–67.) The Executive Committee concurred with Dayan, and on August 26, 2008, Millard terminated Pillay. (*Id.* ¶ 61.) Pillay was not given the reason for his termination at this time. (Pl. L.R. 56.1 ¶ 28.)

**Union Petition**

Rumored for several months beforehand, on August 1, 2008, a union petition was circulated at Millard's Geneva facility. (Def. L.R. 56.1 ¶¶ 39, 41, 50.) In response to the union petition, Dayan traveled to the Geneva facility to meet with management staff to prepare for the union campaign and upcoming election. (*Id.*) Pillay's termination occurred in the midst of this union election. (Pl. L.R. 56.1 ¶ 34.) All managers in place at the time of the union campaign were subsequently terminated. (Def. Resp. to Pl. L.R. 56.1 ¶ 36.) Prior to the union campaign, on July 4, 2008, Millard terminated Assistant GM Carlos Mamarian, and in December 2008, Millard fired Office Manager Peter

Trinidad. (*Id*. ¶ 38.) Domroes testified during his deposition that he believed that he and Pillay were made "scapegoats" for the union campaign. (Def. L.R. 56.1 ¶ 53.) Although Millard terminated Domroes and Polerecky several months after firing Pillay, Domroes explained that Pillay's termination was accelerated because his name came up negatively and repeatedly, and he was "associated in a bad light with a lot of the employees." (*Id*.)

### Post Termination

On September 15, 2008, Pillay sent Millard a demand letter requesting compensation for his termination which, Pillay wrote, was premised on his protests against Ramirez's termination. (Pl. L.R. 56.1 ¶ 30.) On September 26, 2008, Millard responded to Pillay's letter, writing that Pillay's termination was for "good, valid, and lawful reasons" and that "[a]t no time during Mr. Pillay's employment did Millard ever instruct Mr. Pillay to violate, disregard or contravene any federal or state labor laws or any other laws, nor did Millard terminate Mr. Pillay's employment because he refused to violate any such laws." (Pl. L.R. 56.1, Ex. 7.)

In December 2008, Ramirez and Pillay filed claims with the Equal Employment Opportunity Commission ("EEOC"). (Pl. L.R. 56.1 ¶ 31, Ex. 8; Def. L.R. 56.1, Ex. U.) On January 16, 2009, Millard responded to the charges that Ramirez lodged with the EEOC, denying that it "conducted or committed unlawful discrimination on the basis of disability or in retaliation." (Pl. L.R. 56.1, Ex. 8.) Millard further contended that Ramirez's termination resulted from his unacceptable LMS performance rating (*i.e.*, 59 percent) during his tenure as a probationary employee. (Pl. L.R. 56.1, Ex. 8.) On January 21, 2009 Millard responded to Pillay's EEOC charge, stating that Pillay's poor performance as HR manager, taken together with his failure to improve that poor performance and

continued improper and unacceptable treatment of employees, resulted in his termination. (Pl. L.R. 56.1 ¶ 31, Def. L.R. 56.1, Ex. U.)

Following his termination from Millard, Pillay interviewed for positions with the Bartlett Park District and Grohe America but was not offered employment at either. (Def. L.R. 56.1 ¶¶ 69–70.) Sometime after he was denied a position with the Bartlett Park District or Grohe America, Pillay sent Millard a "request for employment verification" from Reliance Data Corp. (a fictitious company). (*Id.* ¶ 71.) Millard replied and provided incorrect dates of employment for Pillay, stating that Pillay's employment dates spanned from December 1, 2000 to August 25, 2008 (when Pillay had in fact been hired on April 17, 2000). (*Id.* ¶ 71, Ex. 19.) Pillay never contacted the Bartlett Park District or Grohe America to determine whether Millard provided accurate dates of his employment. (*Id.* ¶¶ 71, 73.) Pillay is currently employed by Sears where he works in the HR department. (*Id.* ¶ 75.)

## SUMMARY JUDGMENT STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (a). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee notes (1963 amend.) While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L.

Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id*. at 323. In response, the non-moving party cannot rest on bare pleadings alone but must use evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.*; *Insolia* v. *Phillip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne* v. *Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248)).

## DISCUSSION

### I.    Ramirez and Pillay's Motion to Strike

Before delving into the merits of the parties' motions, the court must address numerous objections raised in Ramirez and Pillay's motions to strike portions of Millard's statement of material facts submitted pursuant to Northern District of Illinois Local Rule 56.1. [Dkts. 90; 91; 92.]

Ramirez and Pillay first move to strike eight exhibits (Exs. L, M, N, O, P, T, V, and W) [Dkt. 90] attached to Millard's statement of facts, arguing that these documents are inadmissible hearsay for which the proper foundation has not been laid. These documents consist of complaints lodged by Millard employees against Pillay. "Sworn testimony is not the only basis on which summary judgment may be granted; rather, the court may consider any material that would be admissible or usable at trial, including properly authenticated and admissible documents or exhibits." *Woods* v. *City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000) (citations and quotations omitted). Although Dayan refers to the substance that gave rise to these complaints in his affidavit submitted to the EEOC in 2009 (Def. L.R. 56.1, Ex. K), he did not specifically authenticate these exhibits in his

EEOC affidavit. Millard also failed to submit an affidavit or any evidence authenticating Exhibits L, M, N, O, and P (all of which concern anonymous complaints regarding Pillay) and, accordingly, they will be stricken.[6] *See* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 901.

Exhibits T, V, and W are acknowledged complaints either sent to or requested by Dayan concerning Pillay. Specifically, Exhibits T and W are signed handwritten complaints; Exhibit V is an email sent to Dayan. Although Millard failed to raise this argument, after reviewing Dayan's deposition transcript, this court finds that his testimony authenticates these exhibits. (*See* Def. L.R. 56.1, Ex. I.) Ramirez and Pillay further argue that these exhibits and Dayan's 2009 EEOC affidavit [*see* Dkt. 91] that references these exhibits should be struck as they constitute inadmissible hearsay. Millard, however, offers the statements for the non-hearsay purpose of proving that complaints were made, corroborating Millard's position that it terminated Pillay as a result of receiving complaints. *See Pannizi* v. *City of Chicago Bd. of Educ.*, No. 07 C 846, 2007 WL 4233755, at *5 (N.D. Ill. Nov. 19, 2007) (statements and letters were admissible at summary judgment for non-hearsay purpose of showing that complaints about the plaintiff were made to school officials). Accordingly, Exhibits T, V, W, and Dayan's 2009 EEOC affidavit will not be struck.

Ramirez and Pillay next move to strike the affidavit of Rachelle O'Dell. [Dkt. 91]. They claim that Millard failed to identify O'Dell in its initial Federal Rule of Civil Procedure 26 disclosures, and that her affidavit contains hearsay. Rule 26(a) provides that "a party must . . . provide to the other parties . . . the name . . . of each individual likely to have discoverable information – along with the subjects of that information[.]" Fed. R. Civ. P. 26(a)(1)(A)(I). Rule

---

[6] That Millard failed to authenticate these documents for purposes of summary judgment does not mean that they will not be admitted as evidence at trial.

26(e) further imposes a duty to supplement Rule 26(a) disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, *and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing*." Fed. R. Civ. P. 26(e)(1)(A) (emphasis added). Rule 37 sets forth sanctions for failing to comply with the rule, stating "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion." Fed. R. Civ. P. 37(c)(1). As Millard notes, O'Dell had been repeatedly identified by both sides throughout discovery, in deposition testimony, and in Pillay's answers to interrogatories. As both parties had identified O'Dell as a potential witness during discovery, the court declines to strike her affidavit for non-compliance with Rule 26. *See* Fed. R. Civ. P. 26(e)(1)(A). Ramirez and Pillay also move to strike the following portion of paragraph six of O'Dell's affidavit based on hearsay: "Millard's [WC] counsel was able to confirm Mr. Ramirez did, in fact, have an impairment rating assigned by the Illinois Industrial Commission." Millard did not respond to this argument, and this portion of O'Dell's affidavit will be struck as hearsay.

Ramirez and Pillay last request that the court strike that part of Millard's statement of facts that does not consist of short numbered paragraphs, and contains legal arguments in violation of Local Rule 56.1. [Dkt. 92.] Having considered the specific paragraphs that Ramirez and Pillay argue violate this rule, the court denies their motion to strike on this basis. To the extent that Millard's statement of facts contains improper legal conclusions, the court will disregard them.

14

## II.    Ramirez's ADA Discrimination Claim

Ramirez claims that Millard violated the ADA by terminating his employment based on a perceived disability.  "The ADA prohibits an employer from discriminating against a qualified individual with a disability." *Kersting* v. *Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001) (quotations omitted).  "Congress enacted the ADA 'against a backdrop of pervasive unequal treatment . . . including systematic deprivations of fundamental rights' that people with disabilities were forced to endure." *Dickerson* v. *Bd. of Trs. of Comm. Coll. Dist. No. 522*, 657 F.3d 595, 600 (7th Cir. 2011) (quoting *Tennessee* v. *Lane*, 541 U.S. 509, 524, 124 S. Ct. 1978, 158 L. Ed. 2d 820 (2004)).  To establish disability discrimination in order to defeat a motion for summary judgment, a defendant must prove that there is no genuine issue of material fact and the plaintiff must prove that "(1) [he] is disabled within the meaning of the ADA, (2) [he] is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and (3) [he] suffered from an adverse employment action because of his disability." *Hoppe* v. *Lewis Univ.*, No. 11-3358, 2012 WL 3764717, at *4 (7th Cir. Aug. 31, 2012).  A plaintiff can establish disability discrimination through the direct method or indirect method of proof.  *Dickerson*, 657 F.3d at 601.

### Direct Method of Proof

Under the direct method, a plaintiff can rely on direct or circumstantial evidence to meet his burden.  *Dickerson,* 657 F.3d at 601.  "Direct evidence requires an admission by the decision maker that his or her actions were based upon the prohibited animus." *Id*.  "A decisionmaker is the person responsible for the contested decision." *Rogers* v. *City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (quotations omitted).  "The most common example of direct evidence is a statement by the decision-maker that betrays a discriminatory intent." *Walker* v. *Bd. of Regents of Univ. of Wis. Sys.*,

410 F.3d 387, 394 n.7 (7th Cir. 2005). A plaintiff can also rely on circumstantial evidence to survive summary judgment, namely, "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson,* 657 F.3d at 601. Using circumstantial evidence, a plaintiff can present "a convincing mosaic . . . that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman* v. *Bd. of Educ. of the City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011) (quotations omitted).

Ramirez proceeds under the direct method of proof relying on the August 20, 2008 email exchange between Domroes and Dayan sent the day before Millard terminated Ramirez, in which Domroes stated that Ramirez "was rated 17.5% perm disability" to which Dayan responded, "We have all of this documented right? . . . Let's get him out asap." (Pl. L.R. 56.1 ¶ 7.) Dayan, as head of human resources for Millard, was the ultimate decision maker with regard to terminating Millard employees with less than two years of service (*i.e.,* Ramirez). (Def. L.R. 56.1 ¶ 58.) Dayan's response to Domroes' email is direct evidence that Millard terminated Ramirez because of a perceived notion that he had a disability, conduct which the ADA specifically proscribes. Domroes also corroborated this notion:

> So my question basically to Nick [Dayan] was giving him the facts, just saying that, hey, this gentleman has come here with some physical limitations, he's a new hire, he's still on probation, you know, he's a probationary employee. So my understanding under Illinois law, that, you know, you can be let go for any reason whatsoever. And the second email was from Nick telling me to - - instructing me to let him go.

(Def. L.R. 56.1, Ex. B, Domroes Dep. at 27–28.)

16

Domroes' testimony, at a minimum, evidences a discriminatory intent. Namely, Dayan and Domroes' email conversation occurred *one day* before Millard terminated Ramirez. In addition to this suspicious timing, Domroes further expounded on his belief that Ramirez's prior injury may have precluded him from working at Millard's warehouse, and ultimately precipitated his termination. Specifically, Domroes testified:

> So, you know, to operate a piece of equipment, you need a skill set with, you know, a fully functioning - - I mean, if you're limited in any capacity, and I'm not a doctor, I don't know what 17-and-a-half percent means. But if there's a potential there that he can't steer the forklift properly or brake properly, that he can't manage that, that is a potential risk to other employees. Lifting requirements, I believe it was at least 25 pounds, if not up to 50 pounds, that they're required to lift, so that could be a potential if he's - - he could injure himself. If he was favoring one arm or one leg, he might put undue duress on another part of the body and then potentially risk injuring himself. So I believe that the thought process behind that was to avoid a potential workers' comp claim and injury to himself and/or others.

(Def. L.R. 56.1, Ex. B, Domroes Dep. at 27–28.) With regard to the decision to terminate Ramirez, Domroes explained that "we've had terminations for performance and - - but in this case, this wasn't really performance related directly, it was about his - - his ability to do the job and his injury, previous injury." (*Id.* at 41.) Thus, the documentary and testimonial evidence raises sufficient factual questions from which a reasonable jury could find that Millard had a discriminatory motive in terminating Ramirez. Millard's motion for partial summary judgment with respect to count I is thus denied.[7]

---

[7] Unlike the indirect burden shifting approach, once a plaintiff makes a showing of discrimination using the direct method in response to a summary judgment motion, the employer is not given the opportunity to rebut the discriminatory reason. *See Silverman*, 637 F.3d at 734 n.3 ("Once a plaintiff produces such evidence [under the direct method], the defendant's summary judgment motion necessarily must fail, in contrast to the burden-shifting approach of the indirect, *McDonnell Douglas* method.").

### III.    Pillay's ADA Retaliation Claim

Pillay claims that Millard violated the ADA by terminating Pillay's employment after he protested Ramirez's termination.  The ADA states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  Similar to establishing an ADA discrimination claim, a plaintiff bringing an ADA retaliation claim may rely on the direct or indirect method of proof.  *Dickerson*, 657 F.3d at 601.

### A.    Direct Method of Proof

To establish unlawful retaliation under the direct method, a plaintiff must present evidence showing "(1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two."  *Squibb* v. *Mem. Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007) (quotations omitted).  Pillay argues that he has provided direct evidence of retaliation.

### i)    Whether Pillay Engaged in A Statutorily Protected Activity

Pillay argues that he engaged in statutorily protected activity by protesting against Ramirez's termination.  "[A]n informal complaint may constitute protected activity for purposes of retaliation claims."  *Casna* v. *City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009).  The parties disagree about whether Pillay protested Ramirez's termination.  Pillay argues that after hearing about Millard's decision to terminate Ramirez he requested documentation at which time Domroes forwarded Pillay his August 20, 2008 email correspondence with Dayan on this subject.  (Pl. L.R. 56.1 ¶ 24.)  Pillay testified that he then confronted Dayan protesting Ramirez's termination was premised on an illegal motive.  (*Id*. ¶¶ 25–26.)  Millard denies that Pillay argued against Ramirez's

18

termination and further argues that Pillay advocated for Ramirez's termination. (Def. L.R. 56.1 ¶ 56.) Although the parties dispute that this conversation took place, sufficient questions for the trier of fact exist as to whether Pillay engaged in a statutorily protected activity by protesting Ramirez's termination. *See, e.g., Payne*, 337 F.3d at 773 ("Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied."); *see also Paz* v. *Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664–65 (7th Cir. 2006) ("We have long held that a plaintiff may defeat summary judgment with his or her own deposition.").

### ii) Whether A Causal Connection Exists Between Pillay's Termination and Protest

The parties do not dispute that Pillay satisfied the second prong under the direct method (*i.e.*, he suffered an adverse action) after Millard terminated his employment. Pillay and Millard, however, dispute the last prong, that Pillay's protesting Ramirez's firing triggered his termination. Pillay must demonstrate that his complaint was a "substantial or motivating factor" in Millard's decision to fire him. *Leitgen* v. *Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) (quotations omitted). Although Pillay claims that the timing of his termination (which occurred less than one week after he protested Ramirez's firing) is indicative of retaliation, "suspicious timing alone is almost always insufficient to survive summary judgment." *Id*. at 675.

In addition to the suspicious timing of his termination, Pillay points to Domroes's forwarding Pillay the August 20, 2008 email correspondence between Dayan and Domroes. Pillay contends that this email precipitated his argument with Dayan about Ramirez's termination. Domroes testified that he forwarded the email he received from Dayan approving Ramirez's termination to Pillay because "Sam [Pillay] wasn't going to do anything without getting something

in writing from Nick [Dayan]." (Def. L.R. 56.1, Ex. B, Domroes Dep. at 43–44.) Domroes, however, does not corroborate Pillay's story that he protested against Ramirez's termination and could not recall whether Pillay opposed firing Ramirez. Pillay focuses on the lack of written documentation evidencing Millard's reasons for firing him; however, he does not offer any additional evidence linking his termination with his protest. Accordingly, Pillay fails to show by direct evidence that his protest played a "substantial or motivating factor" in Millard's ultimate decision to end his employment.

### B. Indirect Method of Proof

A plaintiff may also prove his case using the indirect method by employing the burden-shifting test set out in *McDonnell Douglas Corporation* v. *Green*, 411 U.S. 792, 804 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Tyler* v. *Ipsat Inland Inc.*, 245 F.3d 969, 972 (7th Cir. 2001). The Seventh Circuit has elucidated on this burden-shifting test, explaining:

> Under the *McDonnell Douglas* method of proof, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. Finally, the burden shifts back to the plaintiff to prove that the employer's articulated reason for the employment action was a pretext for discrimination and that the decision was in fact motivated by an unlawful factor.

*Id*. (citation omitted). In initially making his retaliation case under the indirect method of proof, a plaintiff must demonstrate "(1) that [he] engaged in protected activity; (2) that [he] was subject to an adverse employment action; (3) that [he] was performing her job satisfactorily; and (4) that no similarly situated employee who did not engage in protected activity suffered an adverse employment action." *Squibb*, 497 F.3d at 788 (quotations omitted).

### i) Whether Pillay Was Meeting Millard's Legitimate Employment Expectations

As noted above, Pillay has presented sufficient facts at this point to allow a reasonable trier of fact to find that he satisfied the first two elements of the indirect method (*i.e.*, Millard ended Pillay's employment as a result of his protesting Ramirez's termination). Pillay must also establish that he was performing his job satisfactorily and that no other similarly situated employees were terminated at the time. Pillay worked at Millard for more than eight years before he was fired in August 2008. During that time, Pillay received good performance reviews in addition to pay raises and bonuses. (Pl. L.R. 56.1 ¶ 11.) Still, "when a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance, but whether the employee was performing well *at the time of [his] termination*." *Peele* v. *Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (emphasis added) (quotations omitted). In May 2008, Millard placed Pillay on a PIP to remedy areas of deficiencies identified by complaints received from other Millard employees. (Def. L.R. 56.1 ¶¶ 45–46.) On June 20, 2008, Domroes concluded that Pillay had "achieved the required improvements." (Pl. L.R. 56.1 ¶ 14.) In August 2008, Pillay's PIP expired. (*Id.* ¶ 15.) Millard contends that the PIP contemplated "sustained results" with which Pillay failed to comply. Still, Pillay received positive feedback during the PIP and, as a result, the plan expired on schedule. Pillay has thus presented sufficient facts showing that he was satisfactorily performing his job in August 2008.

### ii) Whether Other Similarly Situated Employees Were Treated More Favorably

To make a *prima facie* case using the indirect method, Pillay must last show that similarly situated Millard employees received more favorable treatment. "[T]he similarly situated inquiry

is a flexible one that considers all relevant factors, the number of which depends on the context of the case." *Humphries* v. *CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (quotations omitted). An employee must show a "substantial similarity" in comparing himself to the better treated employee. *Id.* "When the same supervisor treats an otherwise equivalent employee better, one can often reasonably infer that an unlawful animus was at play." *Coleman* v. *Donohoe*, 667 F.3d 835, 847 (7th Cir. 2012).

Dayan, as Senior Vice President of Human Resources, had the power to discipline Millard employees who served in a managerial role and to recommend terminations to Millard's Executive Committee (of which he was also a member). (Def. L.R. 56.1 ¶ 58.) Other Millard employees who served in a managerial role, including Domroes and Mike Polerecky received employee complaints, but Dayan did not place them on a PIP at the same time as Pillay. (Def. L.R. 56.1 ¶ 42; Pl. L.R. 56.1 ¶ 36.) Although Millard argues that it subsequently terminated all the managers in place at the time of the union campaign, Pillay was the only manager fired in August 2008. Millard terminated Polerecky in March 2009, and fired Domroes in May 2009. (Def. Resp. to Pl. L.R. 56.1 ¶ 38; Def. L.R. 56.1, Ex. B, Domroes Dep. at 12.) Domroes and Polerecky were similarly situated to Pillay in that they were Millard managerial employees. Although Pillay reported to Domroes, Dayan was the ultimate decision maker in that he recommended terminations to the Executive Committee. Pillay has thus offered sufficient facts showing that similarly situated employees who had been the subject of prior complaints and served in a managerial role were treated more favorably in that Pillay was the first of these employees to be fired. *See Coleman*, 667 F.3d at 846–47 ("Whether a comparator is similarly situated is usually a question for the fact-finder, and

summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue.") (quotations omitted).

### iii) Whether Millard Had Legitimate Non-Discriminatory Reasons for Terminating Pillay

Millard points to numerous facts which tend to show that Pillay's termination was the result of continued poor work performance, not because he protested Ramirez's termination. Having received complaints about Pillay from Millard employees, in May 2008, Dayan placed Pillay on a three-month PIP. (Def. L.R. 56.1 ¶¶ 37, 40, 45–46.) Although Pillay completed the PIP by August 2008, his continued employment was dependent on maintaining "sustained results." (*Id.* ¶ 46.) Subsequently, Dayan received numerous complaints about Pillay. (*Id.* ¶ 60.) These complaints, according to Millard, in connection with the union campaign at Millard's Geneva facility resulted in Pillay's termination. (*Id.* ¶¶ 53, 61, 66–67.) Millard also argues that other high level employees, including Domroes, ultimately were let go as the result of the union campaign over the course of the next nine months. (Def. Resp. to Pl. L.R. 56.1 ¶¶ 36, 38; Def. L.R. 56.1, Ex. B, Domroes Dep. at 12.) Domroes further testified that he believed Pillay's termination was also the result of the union campaign, and that they were both "scapegoats." (Def. L.R. 56.1 ¶ 53.) These facts evidence a legitimate non-discriminatory reason for Millard to terminate Pillay.

### iv) Whether Pillay's Termination Was Pretextual

To survive summary judgment, Pillay must demonstrate that Millard's decision to terminate him was pretextual. "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some actions." *Argyropoulos* v. *City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quotations omitted). Pillay disputes the accuracy of the complaints received in August 2008, and argues that they were an after-the-fact Millard

23

concoction so as to provide cover for themselves. Pillay substantiates this argument by highlighting the fact that some of these complaints were not documented until *after* Millard terminated him. Pillay also points to the lack of documentation created contemporaneously with his termination. Pillay argues that the union campaign did not trigger his termination, noting that other employees such as Domroes did not lose their jobs until several months after Pillay. (Def. L.R. 56.1 ¶ 53.) That Pillay was the only Millard manager working at the Geneva facility terminated in August 2008 bolsters his argument that his termination resulted not from employee complaints or the pending union campaign but, rather, was the result of his protesting Ramirez's termination. In addition, the short time period between which Pillay received Dayan and Domroes' August 20, 2008 email correspondence and when he was fired (*i.e.*, five days) raises questions about why Millard ultimately decided to terminate Pillay. Namely, a question of fact exists about whether Millard terminated Pillay because he protested Ramirez's termination or whether that decision was the result of Pillay's poor work performance. *See, e.g., Payne*, 337 F.3d at 770 ("We must look therefore at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true.") A reasonable trier of fact could conclude that the union campaign in connection with Pillay's prior poor work performance was the perfect storm of events which triggered his termination. Still, the trier of fact could reasonably conclude that Millard's proffered reasons were pretextual and that the real reason for Pillay's termination was the result of his disputing Ramirez's termination. Millard's motion for summary judgment with respect to count II is thus denied.

## IV.    Pillay's Retaliatory Discharge Claim

Pillay next claims that Millard is liable for retaliatory discharge under Illinois law.  "The tort of retaliatory discharge comprises three distinct features: first, an employee must establish that [he] has been discharged; second, [he] must demonstrate that [his] discharge was in retaliation for [his] activities; and finally, [he] must show that the discharge violates a clear mandate of public policy."  *Belline* v. *K-Mart Corp.*, 940 F.2d 184, 186 (7th Cir. 1991).  "Retaliatory discharge cases are generally allowed when an employee is discharged for: (1) filing a worker's compensation claim; or (2) reporting illegal or improper conduct."  *Mackie* v. *Vaughan Chapter-Paralyzed Veterans of Am., Inc.*, 820 N.E.2d 1042, 1044–45, 354 Ill. App. 3d 731, 289 Ill. Dec. 967 (Ill. App. Ct. 2004).

### A)    Exercising Workers' Compensation Rights

"The Illinois Supreme Court has recognized a common-law cause of action for retaliatory discharge where an employee is terminated because of his actual or anticipated[8] exercise of workers' compensation rights."  *Beatty* v. *Olin Corp.*, No. 11-2853, 2012 WL 3854855, at *3 (7th Cir. Sept. 6, 2012).  In addition, in *Pietruszynski* v. *McClier Corporation, Architects & Engineers, Inc.,* 788 N.E.2d 82, 338 Ill. App. 3d 58, 272 Ill. Dec. 778 (Ill. App. Ct. 2003), the Illinois Appellate Court held that the plaintiffs could recover for retaliatory discharge where they had been

---

[8] Anticipated claims presuppose that an injury giving rise to a workers' compensation has already occurred.  *See Williams* v. *Shell Oil Co.*, 18 F.3d 396, 401 (7th Cir. 1994) ("The [Worker's Compensation] Act does not apply to future injuries or even anticipated injuries."); *Wiesman* v. *Kienstra, Inc.*, 604 N.E.2d 1126, 1129, 237 Ill. App. 3d 721, 178 Ill. Dec. 603 (Ill. App. Ct.1992) (holding that the plaintiff did not have a retaliatory discharge claim, as "[t]he [Workers' Compensation] Act does not apply to anticipated future injuries, and an employee's rights under the Act accrue only at such time when a work-related injury occurs.").

terminated as a result of testifying in a coworker's WC hearing noting that such participation served public policy and promoted the interests of the Workers' Compensation Act . *Id.* at 87.

Pillay cannot support his retaliatory discharge claim because he cannot demonstrate any activity in connection with Ramirez's actual or anticipated exercise of his WC rights. Unlike in *Pietruszynski*, where the plaintiffs testified on the claimant's behalf, here Pillay did nothing in connection with an actual or potential WC claim that Ramirez could have pursued. Ramirez's Home Depot claim had concluded by the time he started working at Millard. Millard had nothing to do with that claim. Ramirez had suffered no injury at Millard that would have created a potential WC claim. There is no authority in Illinois extending the tort of retaliatory discharge to protect an employee who tells his employer that it should not fire someone who had filed a WC claim in the past but who had no connection to that earlier proceeding. *See, e.g., Pietruszynski,* 788 N.E.2d at 86 (stating that "[The Illinois Supreme Court] has continued to stress the narrow scope of the tort of retaliatory discharge"). Millard is entitled to judgment on this claim.

### B) Other Illegal and Improper Conduct

Pillay also argues that he has a retaliatory discharge claim premised on illegal and improper conduct, namely that Pillay protested Ramirez's termination because of a perceived disability. Protesting against Ramirez's termination, however, is the same conduct which Pillay uses to substantiate his ADA retaliation claim. In *Stebbings* v. *University of Chicago*, 726 N.E.2d 1136, 1141, 312 Ill. App. 3d 360, 244 Ill. Dec. 825 (Ill. App. Ct. 2000), the Illinois Appellate Court identified the situation where a plaintiff brings a retaliatory discharge claim yet has an adequate alternative remedy, holding:

> It is not necessary or a plaintiff attempting to state a claim for retaliatory discharge to cite to a statute making his or her firing illegal. If that were the case, the tort of

> retaliatory discharge would be superfluous, for the plaintiff would be able to proceed
> under the statute. In fact, a court might be obligated to dismiss the claim in such a
> situation, for one of the factors that a court considers in deciding whether to allow
> a retaliatory discharge claim is the existence of an adequate alternative remedy.

*Id.* at 1141. Indeed, Pillay's ADA retaliation claim reaffirms that he has an adequate alternative

remedy as the ADA provides him with a private cause of action. *Cf. Hamros* v. *Bethany Homes &*

*Methodist Hosp. of Chicago*, 894 F. Supp. 1176, 1179 (N.D. Ill. 1995) (concluding that the "Illinois

Supreme Court would not expand the common law tort of retaliatory discharge to include claims

based on the exercise of rights under the [Family and Medical Leave Act"]). Pillay cannot use the

conduct which substantiates his ADA retaliation claim, reporting disability discrimination, to bring

a claim for retaliatory discharge. Millard is entitled to summary judgment on this count.

## V.    Pillay's Libel/Slander Claim

Pillay next claims that Millard is liable for defamation under Illinois law because it provided

false employment dates for Pillay. Under Illinois law, "[t]o prove a claim of defamation, a plaintiff

must show that the defendant made a false statement concerning plaintiff, that there was an

unprivileged publication of the defamatory statement to a third party by defendant, and that plaintiff

was damaged." *Gibson* v. *Phillip Morris, Inc.*, 685 N.E.2d 638, 643, 292 Ill. App. 3d 267, 226 Ill.

Dec. 383 (Ill. App. Ct. 1997). The question how the incorrect (or false) dates of employment might

have damaged Pillay aside, Pillay fails to demonstrate that Millard communicated false employment

to dates to anyone but himself. Pillay surmises that Millard must have communicated incorrect dates

of employment to prospective employers, relying on the incorrect information that Millard sent to

the fictitious company Pillay created requesting such information. Still, "[t]o show a publication,

it must be established that the allegedly slanderous remarks were communicated to someone other

than the plaintiff." *Gibson*, 685 N.E.2d at 643. Pillay offered no evidence showing that Millard made such a communication with a third party, and thus cannot survive summary judgment.

## VI. Pillay's Tortious Interference with Contract Claim

Pillay last claims that Millard is liable for tortious interference with contract based on supplying incorrect employment dates to prospective employers. Because Pillay contends that he was a job applicant seeking employment, his claim actually lies in tortious interference with a prospective economic advantage. *Fellhauer* v. *City of Geneva*, 568 N.E.2d 870, 877, 142 Ill.2d 495, 154 Ill. Dec. 649 (1991). Under Illinois law, "[a] plaintiff claiming intentional interference with a prospective economic advantage must establish (1) a reasonable expectation of entering into a valid business relationship, (2) the defendant's knowledge of the expectation, (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship, and (4) damage to the plaintiff resulting from the defendant's interference." *Atanus* v. *Am. Airlines, Inc.*, 932 N.E.2d 1044, 1048, 403 Ill. App. 3d 549, 342 Ill. Dec. 583 (Ill. App. Ct. 2010). Again to survive summary judgment, Pillay must offer some proof that Millard actually communicated incorrect information to prospective employers. Because Pillay has failed to do so and merely relies on innuendo, he has failed to meet his burden. Accordingly, summary judgment is granted as to count VI.

### CONCLUSION

Millard's motion for partial summary judgment [Dkt. 82] is granted in part and denied in part. The motion is denied with respect to counts I and II and granted with respect to counts IV, V, and VI. Ramirez and Pillay's motion to strike hearsay documents [Dkt. 90] is granted in part and denied in part. Ramirez and Pillay's motion to strike the affidavits of O'Dell and Dayan

[Dkt. 91] is granted in part and denied in part. Ramirez and Pillay's motion to strike portions of Millard's statement of facts [Dkt. 92] is denied.

This case will be called for a status hearing on October 16, 2012 at 8:30 a.m. The parties are directed to engage in a sincere effort to settle this case and to report the potential for settlement at the next status hearing and whether referral to the magistrate judge for a settlement conference would be helpful.

Dated: September 28, 2012                     Enter: _____
                                                     JOAN HUMPHREY LEFKOW
                                                     United States District Judge